of America. That is 22-1029. And Mr. Brightbill, you're taking the podium first. I'm correct that you reserve two minutes. Is that where we are? Yes, Your Honor. Thank you. Okay. You may proceed. Thank you. I may have pleased the court. With me today are Charles Robertson and Carter Robertson, President, CEO and Executive Vice President of American Cruise Line. So the final action of Marriott should be vacated because the findings that actually support its charter determination are not supported by the substantial evidence. So too, the summary of the charter at issue that was provided to the public for comment was also not supported by substantial evidence. The evidence here, and this is critical, is a charter, a contract and a credit facility, a contract, legal documents that are reviewed de novo by courts. And Marriott itself has established numerous per se factors of foreign control that it held itself to. Let's start more, let's start earlier. What, can you articulate your theory of regressibility to me? The injury here is easily regressible, Your Honor, because the foreign vessel, a foreign competitor, one of the largest, most well-financed cruise ship operators in the world, that every month is advancing money towards the operation of this vessel in competition with my clients. So this is a daily, ongoing, continuous harm that is occurring by virtue of the fact. Right, but isn't part of your theory that you need a favorable ruling because that would have caused financing to be different? Like, what is the theory that would be redressed? There's two, Your Honor. The first is that by vacating the charter determination, by statute, by law, the charter is void. Under the terms of this charter, the Viking is advancing through this day rate. Every month, they pay the money in advance to, through a monthly stipend that goes out to River One. So every month, a check gets written to River One. River One then finances all of the operations with the money that Viking just provided to it. And to the extent that River One ends up spending more money than was actually advanced to it, it gets trued up on the backside. If we vacate, how do you know the result is going to be different? If we vacate, then under the terms of a traditional time charter, the owner has to be bearing some economic responsibility. It can't be... Okay, so your theory is the financing would fall through at some point. Well, for the later vessels, yes, but even as the current vessels, Your Honor, because, again, the current vessel that's on the river, every month, they get money from Viking to finance the operation of that vessel in competition. So we have this problem of standing, and on the whole, our court has said that competitors do have standing, and you say you're better off actually than most because this is a smaller degree of competitors, and we have held that even where there's more. But assuming that you do have standing, isn't this really a fairly standard administrative process case? That is, you said there were per se rules. I think one can read the facts as being not quite in the per se. That is, it isn't that they give all the money, which was the per se, they give a lot. It isn't that they have total control, they have a lot. They went about as they're trying to go as near as they can and get away with it. Okay, but haven't they been able to do that and leave it in the discretion of the administrative agency? So that in the end, the question, at least on this, let's leave aside the FOIA issue, at least on this, isn't this one where essentially we have to put the agency in a situation which is very close, or do we try to make up our own mind? No, I don't think so, your honor. You don't get to the question of deference in this case, because everyone agrees that the findings of the agency must be supported by substantial evidence. And here the evidence is two things. It's the contract, the charter itself. Substantial evidence is not conclusive evidence, right? So like, let's just make sure, I mean, this is a, I think this is fair to say that this was a boundary testing case. As Judge Calabrese indicated, it was some but not all. There was clearly an attempt to get very close to the line. So I think it would be most helpful to us if you acknowledged, like, why that closeness isn't, you know, it's to your benefit. But it's not that there's no evidence. Why is it not substantial evidence? Even if it doesn't, because the standard is not conclusive evidence. No, I actually would submit, your honor, it's zero evidence, because we're talking about a contract, a legal document. Now, you keep coming back to the contract, but I, the contract does certain things. But on several of these things, for instance, you argue that Viking can remove the master. Yes, but the master then is replaced by somebody that River puts in. It's not a total control. They take much of the financial responsibility, and yet River does have some indemnity responsibility. It's not 100% one way. If it were, you'd be right about the evidence. That isn't quite the way I read it. And so the question is, was this a decision that they could make? As I say, I want to come back to the FOIA issue. To the what issue, your honor? The FOIA issue with respect to whether they could exclude a certain type of data from the summary which they have to give. I think that and the more recent requirement is a separate question from the first question which we're talking about. Well, they don't have statutory authority to withhold these things, but one of the things I think is critical, too, is to look at these findings, okay? Here's the first finding. River One would be responsible for hiring, provisioning, and paying the vessel's marine crew, including the vessel master. That is not substantively true. That was a finding that was made and provided to the public and then relied upon to reach the decision because the money is actually coming from Viking, and they're actually paying for all those things and responsible. The next finding, River One would be responsible for vessel maintenance and repair. Again, that is not substantively true. The public was told that. The decision relies upon these findings, and finding after finding, as we've set forth in our brief, is not supported by substantial evidence, because the contract is the evidence, and if the agency did not make findings that are actually supported by the record, which it did not, then it has failed to actually forthrightly consider important questions that are presented against it. Before you can even get to the issue of deference, the agency has to get its facts straight, and it did not. It can only be deferred to if it actually has substantial evidence for those records, if they are substantively correct. Right, but even in, I'm still not persuaded that the substantial evidence versus abuse of discretion is in the right place, but even just to make sure that we're drilling down on your argument, they could be wrong under a substantial evidence about some of them, right, and still meet a substantial evidence standard. It's not perfect evidence. It's not conclusive. It's not 100% right. So the, I guess the question would be is why are the things that that the agency is not correct about enough to have supported this conclusion? Because without accurate findings, then it's administrative law 101. They need to have considered important aspects of the problem, and here, when you look at the findings, the first 10 findings that they make in A386 of the record, okay, every one of those findings is, when you go back to the contract, unsupported or actually weighs in favor of control because they're actually an acknowledgement. So if they get, okay, so if they get up here and tell me there are things that are undisputed and they're able to produce three, five, six, you are choosing to spend your time right now not explaining to me why those aren't enough. Instead, you want to, you want to die on the is, is, is wrong. No, I'm not, I'm not, it's not, it's not, at some point they need to have enough things right that they've actually, that you can actually look. So why don't you tell me what you think they have right and why that is not enough? Sure. So we'll start at A386 and we'll start with findings number 1, 4, 5, 6, 7, 8, and 9, okay, which was that they found on their way to the decision that ECO was responsible for providing the crew, the maintenance and repair, procuring the bunkers, paying and provisioning the vessel's crew, insuring the vessel, paying for the vessel's operating expenses, indemnifying Viking for claims arising out of ECO's operations of the vessel. All of that is substantively wrong. Not all of it isn't. Yes. They did provide some of the crew. They did provide some of the money. Much of the money was provided by another side. It all depends on how you read such a finding. You read it as being, this is all, you're saying just because some of these are not so, the whole thing falls. And that seems to me something that we simply do not do in administrative law cases. I hate administrative law for just this reason, because it's always messy in terms of what the agency says, which is never fully correct and never totally wrong. Your Honor, respectfully, if you go to A83 of the charter, A79, 89, and you work through the charter agreement, you will find that all of these costs and expenses fill within the operating expense, which is part of the data, which is part of what Viking is advancing every month to advance the vessel. Counsel, I want to ask you about the money, about the operating expenses, and about the base rate. There is a tremendous amount of cost passed through, but does ACL acknowledge it's not 100% cost passed through? I, we think it is 100% of the cost passed through, with the exception of the $3,000 a day management fee, which they get for virtue of applying their American citizenship to the endeavor. But other than that, no, I mean, the two things that they cite in the brief are, first of all, that they're, that had they been late delivering the vessel, had the Edison West panoply of companies been late delivering the vessel, there would have been some offset debt. Well, that's not, that doesn't go to the normal operating risks of the vessel once it's at sea. That's, that comes before. That, that was risk that they took on as the builder and contractor of the vessel. So that doesn't actually go to any of these issues in terms of the operating expense. The other thing they try to point to is that if there was a total loss of the vessel that the, that the charter hire would stop. Well, of course, if there's a total loss of the vessel, the, the, the insurance company and under the, under the terms of the various agreements, right, the vessel has to be insured using Viking's money at the replacement cost of the vessel. So yes, the charter hire stops, but Edison West and River One are not at financial risk because they're fully insured at replacement cost of the vessel using Viking's money. What about this late delivery? I'm sorry. No, go ahead. What about the late delivery of the period of time potentially where River One bears the risk? And is that not enough? I mean, they have come very close to the line of full pass through. No, it's irrelevant, Your Honor. That is, that is construction risk that they took on if they were late delivering the vessel. But it is not risk that actually goes to the operation and continued ongoing expenses of the vessel now that it is on the river putatively competing with my client for the next 30 years, Your Honor. If we found that there was full pass through of cost, would that alone be enough? If you found, if, if, if, if you look at the contracts and the agreements and you see that the, under the terms of the various standards that MARAD itself held itself to, right, including the per se factors, right, if you see that under the terms of the contract that they're absorbing all of the costs and normal, doesn't have to be everything, right? It says normal. Okay. So it doesn't, even if it's 98%, right, the, the standard here, the per se standard is absorbs all the costs and normal business risks. That is a per se factor. And once it's per se, there's no discretion at that point. Look, if you are in per se, of course, but the question is, is there enough that they are bearing so that it is out of per se and in the part that gives the agency discretion? I'll submit one more to you, Your Honor, which is that, which is that before you even get to discretion, they, they have to at least get enough of their facts, right? Enough of what they told the public in the public notice has to be substantively accurate. Where do you get that? Because I mean, of course, enough gives you the conclusion, but what is enough? What is, what are facts that are sufficient so that they can say it is out of per se and in discretionary? Well, so for example, Your Honor, on this record, when we can just go to the notice, the proposed time charter notice, it was, it's at 8-260 of the record. And you can just walk through these. River One would at all times hold title to the vessel. Okay. That's, that, that goes to the ownership issue, but it's not relevant. We've kept you over time. I think it would be most useful for you to let us know which ones you do not dispute and why that is not enough. We do not dispute one because it goes to ownership and not control. Okay. We think the rest of these, every single one of them, down to the, down to the last one are, are substantively inaccurate representations that were made to the public, that this is not fairly described the substance of the Well, because at the point at which you're now dealing with public notice, Your Honor, it's, it's not no longer a question of discretion. It's whether the agency provided enough information to the public that the public can fairly participate in the process. Where is that in the requirement? I mean, you've been talking about whether the public might be then whether what they found was sufficient to put it in something which is in their discretion. Again, that's why I hate administrative law because the public is not really that much a part of it. Well, there's two out, there's two issues going on here. Of course, there's the substantive failings of the, of the, of the, of the determination itself. But then there's the public. Well, that's that second thing. That's the second requirement that now has been made that they must give a summary. Now, here we have a problem. Because on the one hand, Congress requires this. On the other hand, they haven't said anything about what should be said. Now, when they did this, they said that FOIA required them to keep confidential certain things. And that's wrong. That's wrong. Because FOIA does not apply here. On the other hand, the agency can keep something confidential on its own. So in its discretion, the agency could do this. Now this, and it's a question I'm going to ask the other side, did they exercise that discretion and therefore not say as much about confidential things? Or did they not exercise that discretion because they thought they were bound by FOIA? Now, that could be a specific error. If they did that. But that's really for the other side. Well, and I'll be interested in the answer to that question too, Your Honor, because when I read what they, the reasoning that they offered, they seem to offer up that FOIA required them to take that course. But let me just finish Judge Perez's question in terms of the findings, because I want to make sure I'm very clear. So the first one goes to ownership, not relevant. The next one, two, three, four, so four out of seven are substantively inaccurate because Viking is actually paying for all these things. They're paying for part of those things. No, all of these things. It's paying for all of these things, Your Honor. This is in your brief. I just wanted to, what I was more interested in, and you'll obviously get some time on the rebuttal and your client more than got their money's worth with 11 minutes over time. But I was more interested in why what you conceded was not enough. But we'll hear back from you. You've reserved two minutes. Thank you, Your Honor. Thank you. And Mr. Ross, you need to not be stressed out that you have 11 minutes to cover and six minutes. We'll keep you as long as we need you. Can you start with Judge Calabresi's question, please? Yes, Your Honor. Thank you. Jason Ross for the United States. The question being? My question being, you were wrong in saying that FOIA required you to keep confidential certain things because FOIA does not apply here. It is a specific requirement on your part, on the other hand, you do have the power, discretion to keep those things out. And so what I want to know is, did you exercise that discretion or did you believe that you could not release these things because FOIA requires you to, which would be erroneous? And I just want to make sure by you, we mean your client. Yes. My understanding of the agency's decision, and this is page 383 of the record. I'm sorry, neither of us are going to be able to hear you. You're going to need to speak closer. Both Judge Calabresi and I are hard of hearing. Sorry. Is this better? So page 383 of the record indicates that the agency invoked the substantive standard for confidential business information under Exemption 4 of the Freedom of Information Act, but not that they actually invoked the statute itself. In addition, the Viking and RiverOne specifically requested that various information be kept confidential during the administrative proceedings before Congress enacted the fiscal year 2021 National Defense Authorization Act. So the agency was not necessarily invoking FOIA as a way to avoid disclosing information. Rather, it was invoking the substantive standard. Wait a minute, not necessarily. Is that your interpretation? That was just like a hedging lawyer speak. Do you mean they were not invoking? That's my understanding, Your Honor. Yes. And to make it abundantly clear, the charter agreement and the financing documents specifically indicate that the contracting parties intended for the information to be kept confidential. So in addition to RiverOne's request to the agency that it be kept confidential, the relevant contracting documents themselves indicate the party's intent that they be kept as such. Okay. So your colleague on the other side has indicated that it was so riddled with factual errors that what remains is not substantial evidence. It seems to me that you have two ways you can respond to this. You can either explain to us why the errors are not errors, or you can explain why the undisputed ones are enough. I don't know which one you're going to pursue, but that's what we need to hear right now. I think we can start with the second point, Judge Podesk, that is the undisputed ones are enough. At all points, RiverOne, the vessel owner, maintained operational control of the vessel, including through the vessel master, and RiverOne shouldered financial risk consistent with the terms of vessel ownership. That's enough. In Marriott's 1990 rulemaking for Section 221.13, it specifically cited a number of examples in which those facts were not the case in various exchanges of vessel ownership and indicated that would be evidence of a bareboat charter. That's exactly not what happened here. Rather, RiverOne maintains title to the vessel and has control over the vessel through the vessel master. I urge the Court to look to Section 14. What do you make of the fact that the Viking can look at all the documents, all the records, all the finances, if they do not have power as a result of that? Why would that be given to them if that didn't imply a degree of power beyond the specific language? Judge Calabresi, Section 37 of the Charter Agreement provides only a limited right to inspect RiverOne's books and records, only to the extent that the books and records concern the operating expenses, the OPEX, as referred to in the agreement. They don't have any rights to inspect RiverOne's books and records with respect to its fixed costs, how it pays taxes, any other respects in which the organization... So you are focusing much more on really is still in control. Yes, and just to conclude the point, the fact that Viking has only a limited right to audit RiverOne's records only underscores that it doesn't have complete insight as to RiverOne's operations. So how are we to deal with the difference between operating costs and fixed costs? I mean, under this law, is the fact that, by and large, your clients still have control and responsibility for some of the fixed costs enough? Or is what they're saying that, by and large, to the operation costs, it's the other way, but that makes it per se? So just to clarify, my client is the United States. Yeah, I'm sorry. It's okay. Of course. Of course. But that actually only demonstrates that the agency reasonably determined, based on the party's representations, that Viking would not have complete control over the vessel. And even if Viking is paying certain of the operational costs, that's completely consistent with the normal terms of a charter hire. Think of, for example, when you order a fare, when you pay the fare for the car ride, those go to the operational costs of the vehicle. Similarly here, when Viking is paying for a term of hire for a vessel, for a passenger cruise ship, it's paying for all the operational costs of the cruise ship while it's operating passenger cruises. That's perfectly reasonable and consistent with centuries of maritime law, that the charterer is paying the operational costs to the vessel owner, but the vessel owner maintains control over the operations. Counsel, was the agency's determination that River One bears financial risk reasonable in light of the fact that both the base rate and OPEX provide that money is paid to River One and that really insulates them from financial risk? That's not quite right, Your Honor. And that's because River One actually shouldered substantial risk during the initial period of construction of the vessel. So the only risk that I've been able to determine that they shoulder is the risk that they may deliver the boat late. But that's a substantial risk. Section 11.3 of the agreement stipulates that River One could be liable for potentially millions of dollars in liquidated damages were the boat late. Well, it's 10 million dollars in liquidated damages, correct? Some of the information is under seal, so I don't want to say publicly, but that I just urge the court to consult the charter agreement in the administrative record. And that's no trivial sum, regardless of what it is. More to the point, the lender would be able to claw back the financing or River One would have to pay a balloon payment for the entire terms of the loan were the vessel delivered sufficiently late. And that's on pages 15 and 48 of the administrative record. So the substantial sum extended by J.P. Morgan is also subject to immediate payment were the vessel delivered late. Moreover, even if the vessel is completely lost during the period of the charter hire, River One is still obligated to repay the initial sum that Viking advanced for purposes of constructing the vessel. Let me ask you, your client is the agency, which is why you're the government, and you're probably underpaid as against if a client were somebody else. But if the agency had decided the opposite way, would that also be defensible? That is, are you saying that this is something that must come out this way or that there was enough so that it's one of the things that the agency decides and then we defer to the agency? It's difficult for me to speculate how the basis for the agency's decision were to result in the, decide in the other direction. But I think it's worth consulting the text of 46 CFR 221.13 on the score, which indicates that essentially any charter is given automatic approval by the agency except for a bareboat charter. And a bareboat charter is basically giving all control to another person except for the title. If I could bring you back to the question though, the way that I understood Judge Calabrese's question is how the government views the standard and the issue of discretion. So the question is not, so he asked, would there have been enough? And would you be in a position where, would there have been enough if they had decided the other way as well? I mean, they both can be true at the same time. I just don't think there's enough here to demonstrate that there's a bareboat charter. It's difficult for me to say the contrapositive in this case, because there are several indicia of control. So both of you are arguing really fervor out that you might need to win. I don't think so, Your Honor. And the substantial evidence standard for the agency's decision is essentially that if you find something that the agency articulated that supports its bottom line, then you should deny the petition for review. And River One itself, excuse me, Counsel for American Cruise Lines itself has conceded that River One maintains legal title to the vessel. In many ways, that's enough. In the Supreme Court's Guzman decision. But okay, so I feel like that's not going to be fruitful anymore. So I want to move on to the other point. Are you, is there a reason for, so he says that the second all the way to the second to the last findings are wrong. They're either not supported or they're erroneous. If he is correct, what are we supposed to do with that? I think he would still deny the petition for review. Okay. Do you believe he is correct? No. And tell me why. For one, I can go point by point. I don't think that would be helpful to you. Broad picture. Broad picture. Yeah. So River One maintains operational control of the vessel. The vessel master directs the crew and the crew is responsible for the safety and welfare of the vessel. Section 14 of the Charter Agreement makes this clear. And the fact that the other side can remove the master and remove the master and remove the master let's assume there's no good faith requirement, doesn't matter because River One still appoints a new master and that master is in control. Two points, Your Honor. First is that River, excuse me, Viking's right to replace the vessel master under Section 13.3 is not an unqualified veto right. Yeah. It has to be. I assumed for River One. The second point is that to appoint a new vessel master and that they could just appoint someone to oversee the existing vessel master, not even to replace. More to the point, your hypothetical posits that Viking would not be acting in good faith. And indeed, Section 13.3 requires a predicate of unsatisfactory performance. So it's not as if they can replace or request that the vessel master be replaced ad infinitum, but instead that there has to be some predicate unsatisfactory performance. And the agreement embodies the notion that Viking has a substantial reputational risk at stake in this charter agreement. It's a professional cruise ship operator that is well-respected in Europe and the United States. And they often book these luxury cruise lines, I think one to two years in advance. So it's not at all in Viking's interest to sort of exercise some sort of veto right on an ongoing basis when it is selling these cruise itineraries many, many months in advance. And that would only disrupt the operations of this vessel. And, you know, I will also fight the premise of your question, which is that the charter agreement embodies both parties' understanding that they will act in good faith. To continually replace the vessel master with no cause whatsoever, you know, begs the question whether the Viking is actually acting in good faith. So can I ask you one process question and then I'm going to ask you to go to the If we vacated the Merritt decision, would Merritt at this point request more information and would they go through a new public comment? Would Merritt have to initiate an enforcement action? What happens if we disagree with you and vacate? I think it depends on the basis for the court's vacator. If you vacate the rule on procedural grounds, then the decision would go back to the agency and it would be up to the contracting parties whether to request another decision. Because I will reiterate 221.13 only provides the agency's blanket approval. So far as I understand, the J.P. Morgan financing is out the door and will not be clawed back by the financer. So if the court vacates on procedural grounds, I don't know what would happen because it's up to the contracting parties. Because it would not happen unless somebody did something. Yeah. Okay. And then? And if the court determines or holds, I think contrary to the record, that this is a bare-bone charter, then the, you know, again, the agency would have to go through a decision-making to evaluate the final order. But more to the point, there could potentially be an enforcement action brought by Merritt, and that's under its regulations in 46 CFR subpart E, in which it can assess civil penalties for vessels improperly operating in the coastwise trade, the Coast Guard, and the charter. Yeah. Then Merritt would try, would be charged with enforcing that decision of ours. Merritt, as well as the Coast Guard, and Customs and Border Protection, which are typically charged with enforcing the coastwise laws. And just for the court's edification, I can provide 46.12.151 is one provision for enforcing those penalties, as well as 19 U.S.C. 1706A. And that's those agencies' enforcement discretion to assess penalties. And they are relatively substantial. Okay. So can you talk to me, then, about the process? Why were the comments addressed, or were they addressed? Why were they not to summary? Why were comments appropriately considered? Why was the process appropriate? Because the Maritime Administration complied with the terms that Congress required it to take. That is, it gave a detailed summary, and it provided a period for public comment. I think comparing the comments that American Cruise Lines provided at pages 272 to 279 of the record, and comparing that to their opening brief, you'll see a remarkable similarity. That is, they raised most of the substantive concerns with the charter agreement during the protection. The agency's decision carefully explains why it disagrees with various commenters' objections, and the notice itself provides the requisite summary of the charter agreement's terms for the public to be able to understand what the legally salient aspects of the agreement were. Do you have a metric for us to say when enough is enough? I don't, Your Honor, and this is, frankly, the first case involving the text, a detailed summary. NEPA requires a detailed statement, which we contend is different from a detailed summary. Had Congress intended for the agency to say more, it would have said so. So you're saying the fact that there was more prescriptions in NEPA than there are now suggests that it would be inappropriate to hold it to the standard of NEPA? Correct. Yes, thank you. After further questions, we urge the Court to deny the petition for review. And, Mr. Breitbarl, you've got two minutes left, but we'll keep you as long as you need. Oh, my understanding was that you'd ceded your time, unless we needed you. Oh, I'm sorry. I should have been more clear that the intervener had requested four minutes of argument time. I don't know if the way that we had planned to do that. Well, I can't hear you. Okay, give me just one sec to think. Okay, please. May it please the Court, I'm Shai Voretsky representing the intervener Viking. Mr. Arthur Kratz is here today representing RiverOne. We had planned to divide the time with the government two ways. Mr. Kratz was not planning to make a presentation to the Court, unless the Court has specific questions for RiverOne. That was where I was confused. Okay, please proceed. Recognizing how long this has gone on, I propose, if I could, to make three points, and otherwise, of course, to answer any questions that might be helpful to the Court. One, on the standard of review here, as Judge Calabresi said earlier, this is a standard administrative law case where the agency gets deference, as long as its findings are supported by substantial evidence, and as long as its conclusions are plausible. I also think it's important to consider what question the agency itself was answering. And the agency was distinguishing between a time charter and a bare-boat charter. Under black-letter maritime law, something is only a bare-boat charter if it transfers virtually all control, basically everything but the paper title, to the foreign entity. Here, however, particularly under a deferential standard of review, there are a number of findings that Mayrad made that show that this charter falls far short of being a bare-boat charter. And I would also point out, when we're talking about particular findings, we're looking at the findings in the final agency action, which is at 386 to 387. Mr. Breitbaugh, I believe, was ticking through findings in the public notice, which is at 260 to 261. That's not the final agency action that's under review. When you look at the findings at 386 to 387, it is undisputed, to your point, Judge Perez, that Viking had no purchase option at the end of the charter. It is also clearly supported by substantial evidence that River One had exclusive control over operations of the ship. Viking controlled the hospitality aspects of the ship. It decided what time dinner would be and when the guest rooms would be cleaned. But River One had full operational control over the ship. Yes, Viking had the right to ask that River One replace the vessel manager, but there are significant guardrails on that. It is only for unsatisfactory performance. And even then, Viking can't unreasonably withhold its consent to the reinstatement of the original vessel manager if the performance is cured. So this is not a situation where Viking has the operational control over the ship. River One has that. Judge Nardacci, with respect to your questions about financial risk, there are a number of respects in which there was significant financial risk here that River One undertook. Yes, there's the liquidated damages caused pre-delivery. Bear in mind that this contract was signed in January 2020. So as things turned out, there actually was, given COVID supply chain issues, significant risk that this vessel would be delivered late and that River One would be on the hook for that. Afterwards, there's the risk of total loss. There's also the possibility that River One would have to repay Viking for some of the advanced charter hire. There are back office expenses associated with running this enterprise that Viking does not reimburse. So this falls short of being all costs being absorbed by Viking. Lastly, on the FOIA issue, two quick points. One, Congress simply required a summary here. It did not require, as it did in NEPA, a detailed statement. I'm not saying that Congress required more. I'm just wondering whether what you gave was less than you intended or might have given because you made an error as to the application of FOIA. And I think Mr. Ross, on behalf of the agency, has represented to the court that it didn't make an error. It was exercising its discretion in what it chose to disclose, reflecting and honoring the party's request for confidentiality. And lastly, I would just point out, and I recognize I'm over time, so I refer you to our brief. ACL did comment on virtually all of the arguments that it is making to the court today and in its brief. It commented on an off-hire provision. It commented on whether Viking can interfere with operation of the ship by requiring dismissal. It required on what, it commented on whether an advance payment is typical. It commented on the possibility of passing through expenses and a potential right by Viking to approve or disapprove the budget. And it commented on the relevant legal standards. And so the public notice was sufficient because the proof is in ACL's actual comments, which mirror those that it's making to the court today. Thank you. Thank you. Thank you. Okay. Now, Mr. Brewer. Thank you, Your Honor. I'm going to start right there and with Fertilizer Institute v. EPA. When the Congress mandates public notice, an agency, quote, must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment. And that's exactly what they're trying to do here. Further on this issue, Judge Calabresi, they don't have discretion. Okay. I'm sorry. And you don't need to feel super rushed because we want to get this right. Okay. I know you were marching through this being mindful of your time. So they cannot bootstrap it. That begs the question as to why the notice wasn't enough. I'll come to your question. I'm sorry, Your Honor. I wasn't tracking what you were trying to ask me before. So I'll get to it. Look, the standard here is that the notice must adequately frame the subjects for discussion and provide sufficient factual detail to enable the public to comment in a meaningful and informed manner. You commented a lot. You made a lot of comments. Does that suggest the notice was sufficient? Well, except this goes to your question, though, is how many undisputed facts are sufficient or how many problems, how many errors are sufficient to knock this down? And I would say any material misstatement of fact, either in the proposal or that went out to the public, or in the final finding is sufficient. Is there a case that says any material mistake? I mean, part of the problem with the, well, not part of the problem, part of the feature of notice and comment is to surface issues, right? So that seems like to be a pretty, that's a little bit hard for the whores to expect them to always be perfect, right? So what's the best case you have for any material mistake in a notice would make the notice inadequate as a matter of law? Well, I would refer the court to, again, to the Fertilizer Institute, the EPA case for the principles. But in terms of, it follows from first principles of administrative law that an agency must fairly consider important issues. And if an agency has made any material factual misfinding, then it has failed to consider important issues that weigh to the decision. It has both failed to give appropriate notice to the public and it has failed then ultimately if it has made material mistakes in its findings. It cannot be said to have... If what you say is literally true, there would not be a single agency finding that we would not reverse because there always is an error. I've been here 30 years and there's always an error in something the agency does. Well, Your Honor, it's more than one here. And there are many material mistakes. I know. But what you had just said was if there is one, that's enough. And I find that hard. Of course, if there are enough. Enough tells you... But Your Honor, I would beg to differ a little bit on that, which is it's one thing for an agency to draw conclusions from a record. But it's another when the actual contract substantively is different than what they represented to the public. But as to this issue of the... No, of course. Yes. Okay, thank you. So on the issue of FOIA, though, Your Honor, asked a question of the government from the premise that they had discretion to withhold information, even if it wasn't under FOIA, Your Honor. But there is no such discretion because what we are dealing with here, an agency only has that authority which has been delegated by Congress. And in creating this public comment notice in the NDAA of 2021, Congress did not grant the agency that discretion to withhold information that would be material to public comment. And therefore, it doesn't matter... Where do you say that when Congress said they should give a summary, they meant for that summary to include confidential information? Well, it certainly, I think, implied as first principles of administrative law and public comment that as Viking itself and the government has acknowledged that the information must at least provide sufficient detail to enable meaningful public comment in an informed manner. And on issue after issue, that information was not in this scarcely more than one page notice. There's also this issue of full operational control, Your Honor. This has not been responded to by the government or Viking. But onboard, this charter contains two really exceptional provisions of that grant Viking onboard personnel in operational, having operational influence and ultimately even control over the vessel when it's at sea. First, it provides for a charter representative who is in direct contact with the crew, 16.5, A93. And the crew is not defined to be, hey, this is my liaison with the captain. The crew goes all the way down. We've read the briefs. And so the second one is? Is the charter brand manager, 892.15, with whom and shall have the right to place on board the ship a brand manager who shall be the charter's representative and with whose reasonable request the master shall comply unless it would be a direction to do something unsafe, break the law, or tellingly cost eco money. There are actually personnel in this charter agreement that are influencing and even have the ultimate authority. Well, influencing, no doubt. Ultimate authority is another step. Where do you get that? 16.5, Your Honor. In talking about the charter's representative, the contact person shall be authorized to make decisions, we're talking about the charter's representative, on behalf of the charter in matters occurring on board the ship, provided that the master shall be entitled to rely upon the direction of the brand manager in the event of conflicting decisions. The charter actually places expressly, we've got a charter representative who's directing the crew, watching the actual operation of the boat. We have the paper captain, the vessel, which, by the way, under the Guzman case, the Supreme Court itself in 1962 recognized that you could have a paper captain and still have a bareboat charter in that decision. But this contract on its face right here, you've got two individuals who are both able to influence the crew, and it recognizes that ultimately the Viking brand manager is the person who breaks the tie. Okay, so I'm in a position where I'm trying to be mindful of the time, so you've got just to sum up right now. So at the end, though, let's go back to the Meacham case, which is the only case that any party has cited whose facts, analysis, holding is analogous to the issues that are presented here. And just like in the Meacham case, this was 100% Viking money, right? On one side of the ledger, you've got assets. This is Accounting 101. You've got assets on one side of the ledger, and you've got debt and equity on the other. The asset here is a $186 million vessel, okay? 100% of the debt came from J.P. Morgan and on this side of the ledger, 100% of the equity came by virtue of the Viking prepaid charter. They built the boat. They funded the boat. There was absolutely no upfront cash provided. Okay, I think we understand the argument. And that is one more per se violation. Okay, okay. I got it. Thank you, sir. Thank you so much. And we'll take it under advisement. Okay.